[Cite as *In re S.M.*, 2017-Ohio-1481.]

STATE OF OHIO )  IN THE COURT OF APPEALS
)ss: NINTH JUDICIAL DISTRICT
COUNTY OF WAYNE )

IN RE: J.M.  C.A. Nos. 16AP0074
S.M.  16AP0075

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE Nos. 2014 JUV-C 000551
2014 JUV-C 000552

DECISION AND JOURNAL ENTRY

Dated: April 24, 2017

HENSAL, Presiding Judge.

{¶1}    Appellant, R.M. ("Father"), appeals the judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor children, S.M. and J.M., and placed them in the permanent custody of Wayne County Children Services ("CSB").  This Court affirms.

I.

{¶2}    S.M. (d.o.b. 4/8/04) and J.M. (d.o.b. 4/2/06) had spent most of their lives in Father's custody and care, and were living with him in May 2014, when CSB filed a complaint alleging that the children were dependent, neglected, and abused.  The agency premised the allegations in large part on an incident of domestic violence between Father and his girlfriend ("Girlfriend").  Girlfriend hit Father's car with an axe and broke the window with a chair leg.  Both children were in the car at the time of the incident, and S.M. sustained a laceration

requiring stitches as a result of the broken glass. During the incident, Father pushed Girlfriend down, pulled her hair, and threw pieces of broken furniture, all in the presence of the children. G.B. ("Mother") was in residential drug treatment at the time. Both Mother and Father have a lengthy history with Wayne and Cuyahoga Counties Children Services, involving issues of domestic violence, substance abuse, and ongoing concerns arising out of the parents' failure to provide for the children's basic needs. Based on these concerns, the children were removed from Father's custody and placed in the emergency temporary custody of CSB.

{¶3} At the adjudication hearing, Father stipulated to a finding that the children were neglected. Mother, who did not personally appear because she was in drug treatment, indicated through her attorney that, although she had no information regarding the truth of the allegations, she did not wish to contest them. CSB dismissed the allegations of dependency and abuse, and the juvenile court found that S.M. and J.M. were neglected. Upon disposition, the juvenile court granted temporary custody to CSB, and ordered both supervised and unsupervised weekly visitation for Father. In addition, the court ordered that Father was to have no contact with Girlfriend. The trial court adopted the agency's proposed case plan.

{¶4} Father moved for legal custody. At the hearing on the motion, the trial court returned the children to Father's legal custody under an order of protective supervision by CSB. The court further ordered that neither Father nor the children were to have any contact with Girlfriend. Three months later, CSB moved for immediate review of the custodial arrangement, based on information, inter alia, that Girlfriend was living with Father and the children, and that Father and Girlfriend had gotten into a fight in public. At the hearing on CSB's motion, the juvenile court maintained the children in Father's legal custody under an order of protective supervision by the agency. It further maintained the prior orders, including the no contact order

relative to Girlfriend. At a subsequent review hearing, the juvenile court granted a motion by CSB for a first six-month extension of protective supervision.

{¶5} Approximately seven weeks later, however, CSB filed an emergency motion to modify disposition, requesting an emergency order of temporary custody. In support, the agency alleged that there was a domestic violence complaint involving law enforcement arising at Father's home between him and Girlfriend, and resulting in Father's arrest. In addition, the agency had lost contact with Mother after the previous review hearing. The juvenile court granted an emergency order of temporary custody of the children to CSB and scheduled a shelter care hearing.

{¶6} At the hearing on CSB's motion to modify custody, the parents waived the presentation of evidence. Father admitted that he had violated the no contact order and that he and Girlfriend had gotten into a violent altercation. The juvenile court placed the children in the temporary custody of CSB, ordered weekly visitation for the parents, and maintained the no contact order. A few months later, the trial court granted a second six-month extension, maintaining the children in the temporary custody of the agency.

{¶7} As the case approached the two-year time limit, Father moved for legal custody and CSB moved for permanent custody. The juvenile court held a two-day evidentiary hearing on the final dispositional motions. The guardian ad litem recommended that the children be placed in the permanent custody of the agency. The juvenile court found that the children had been in the temporary custody of CSB for 12 or more months of a consecutive 22-month period and that an award of permanent custody to the agency was in the children's best interest. The court denied Father's motion for legal custody and granted CSB's motion for permanent custody.

Father timely appealed and secured a stay of judgment. He raises one assignment of error for review.

{¶8} Mother filed untimely appeals from the judgments regarding each child. This Court dismissed her appeals by journal entry. *In re J.M. and S.M.*, 9th Dist. Summit Nos. 16AP0086, 16AP0087 (Mar. 23, 2017).

II.

**ASSIGNMENT OF ERROR**

THE WAYNE COUNTY JUVENILE COURT ERRED BY GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY BECAUSE ITS DETERMINATION THAT THE BEST INTERESTS OF J.M. AND S.M. WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶9} Father argues that the trial court's finding that an award of permanent custody was in the best interest of the children in satisfaction of the second prong of the permanent custody test was not supported by sufficient evidence and was against the manifest weight of the evidence. This Court disagrees.

{¶10} Sufficiency and weight of the evidence are both quantitatively and qualitatively distinct. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 23. "[S]ufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a [judgment] is a question of law." *Id.* at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶11} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations

omitted.) *Eastley* at ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} The juvenile court found that the first prong of the permanent custody test was satisfied because S.M. and J.M. had been in the temporary custody of CSB for at least 12 of 22 consecutive months. Father does not challenge that finding; rather, he solely challenges the finding that permanent custody is in the best interest of the children.

{¶14} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be

achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

<u>Interactions and interrelationships, including the children's wishes</u>

{¶15} The first best interest factor requires the juvenile court to consider the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]" R.C. 2151.414(D)(1)(a). The second best interest factor requires consideration of the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]" R.C. 2151.414(D)(1)(b).

{¶16} Mother has played a very limited role in the children's lives, in large part because of long term substance abuse issues which have resulted in her repeated incarcerations and stays in residential treatment programs, as well as her inability to maintain employment and stable housing. No party, including Mother, has proposed that it would be in the children's best interest to be placed with Mother.

{¶17} Until the children's removal, Father had been their primary caregiver. There is no dispute that Father and the children have always had close and loving relationships with one another. Father is deeply committed to the idea (if not the acts necessary) of caring for the children, and has in some instances adequately provided for their basic needs. The children have consistently expressed a desire to live with Father. Caseworkers, therapists, and the guardian ad litem have all testified that there is a close bond between Father and the children, and that the children will suffer some harm if that bond is severed.

{¶18} The children, a brother and sister who were 12 and 10 years old at the time of the hearing, have always been together except for a very brief stay in separate foster homes. They appear to have a fairly normal sibling relationship, including moments of both solidarity and bickering, although J.M. has shown some physical aggression towards her brother. The children have generally acclimated well in their foster home environments, although J.M. has exhibited some attention-seeking behaviors, including attempting to dress provocatively and smearing her feces on the walls. The foster mother was able to mitigate the child's extreme behaviors. At some point, the children disrupted from a foster care placement based on allegations by another foster child that both S.M. and J.M. had perpetrated acts of sexual abuse. They are currently in another foster home under intense supervision of the foster parents. According to the guardian ad litem, incidents of inappropriate behavior by J.M. have waned.

{¶19} Father and the children had limited contact in the several months preceding the hearing. Because of a bed bug infestation in Father's apartment, the children were not permitted to visit with Father there. Moreover, CSB policy prohibits visitors who are exposed to bed bugs from coming to their facility, so visitation could not be facilitated at the agency either. Although Father and the children were permitted to have liberal telephone visitation, Father often would not answer his phone when the children called. Father had not answered calls from the children in the two weeks prior to the second day of hearing. Early on, the children spoke with Father on a daily basis. As the case continued and Father often did not answer his phone, however, the children requested weekly phone conversations which lasted about five minutes per child.

{¶20} While there was testimony in this case that Father did not pose any threat to the children, and that he would in fact take measures to protect the children, Father was responsible for exposing the children to Girlfriend whose presence has had a significant effect on them.

There is no dispute that the interaction and interrelationship of the children with Girlfriend created a danger to the children's psychological, emotional, and physical health and wellbeing. Father and Girlfriend interact aggressively and violently. The initial removal of the children was premised on a violent altercation between Father and Girlfriend in the presence of the children. During that incident, as the children sat in Father's car, Girlfriend swung an axe in a fit of rage and hit the car. She then began to beat on the car's windows with the wooden leg of a chair. Her efforts shattered a car window, hurling shards of glass upon the occupants. Bits of glass lacerated S.M.'s leg, requiring stitches. Father admitted that the children were scared and crying as a result of Girlfriend's actions.

{¶21} On another occasion after the juvenile court returned the children to Father under an order of protective supervision, deputies were called to a trailer park where Father was living with the children and Girlfriend. The two were engaged in a violent altercation, not merely in front of the children, but involving one of the children. At one point during the altercation, Girlfriend gave a knife to S.M. and told him to stab Father. A deputy arrested Father when the investigation indicated that Father had been the primary aggressor. As Father was being arrested, he requested that the deputy call CSB to take the children into custody because he was afraid for their safety if they were left with Girlfriend. Father admitted that he believed Girlfriend would harm his children, because she had physically abused another of her own children.

{¶22} There was evidence that Girlfriend had berated the children on multiple occasions and commented that she would kill them. She physically abused one of her own children while S.M. and J.M. were present. Girlfriend's three children (two of whom were fathered by Father), are the subjects of a dependency, neglect, abuse action in Cuyahoga County.

{¶23} Recognizing the detrimental effect of the Father-Girlfriend dynamic on the children, the juvenile courts in both Cuyahoga and Wayne Counties issued no contact orders, prohibiting Girlfriend from having any contact with Father or the children. Nevertheless, Father was never able to demonstrate that he could fully disengage from Girlfriend. In fact, at the time of the final dispositional hearing, Girlfriend was pregnant with her third child with Father. In attempting to explain his failure to break ties with Girlfriend, Father asserted that it was difficult to do given that they had children together. In the absence of evidence that Father had terminated his relationship with Girlfriend, she would continue to have a detrimental impact on the children should they be returned to Father's custody.

Custodial history of the children

{¶24} The third best interest factor requires consideration of the children's custodial history, including whether they have been in the temporary custody of CSB for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c).

{¶25} From the children's birth, Father was their primary caregiver, even when Mother was not in jail or residential drug treatment. S.M. and J.M. were 10 and 8 years old, respectively, when they were removed from Father's custody due to a violent incident between Father and Girlfriend, during which S.M. was physically injured. CSB was awarded temporary custody. Although Father regained legal custody during the pendency of the case, it was short-lived. The children were again removed from Father after another violent incident between Father and Girlfriend. By the time CSB filed its motion for permanent custody on April 19, 2016, the children had been in the agency's temporary custody in excess of 12 months during a consecutive 22-month period.

Need for a legally secure permanent placement; less restrictive viable options

{¶26}  The fourth best interest factor requires the juvenile court to consider the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"  R.C. 2151.414(D)(1)(d).

{¶27}  Neither parent has demonstrated the ability to provide a safe, stable home for the children.  Mother has not been able to maintain stable housing or employment due to her frequent incarcerations, disappearances, and involvement in residential drug treatment programs.

{¶28}  Father had multiple residences during the pendency of the case, due in part to an eviction from one home and ejection from a campground due to loud interaction between Father and Girlfriend.  Father had been living in a 2-bedroom Metropolitan Housing unit for about six months as of the first date of the hearing.  The apartment was infested with bed bugs for several months, and Father threw away all his furniture due to the infestation.  As of the second date of the hearing, Father had acquired an inflatable mattress for one child, but no furniture for the other.  Girlfriend had kicked a hole in Father's door to gain access to his apartment.  As of the date of the hearing, the hole had not been repaired, although Father testified that a work order for repair was pending.  Father was hoping to terminate his lease and find alternate housing, leaving his future housing situation speculative.

{¶29}  Father's employment history was also unstable.  He was not always forthcoming to the agency with information regarding his employment.  By the time of the hearing, he had obtained a manual labor job as an independent contractor, working 20-30 hours per week, earning $800-1000 per month before taxes.  Father admitted that he had had some negative interactions with coworkers.  In fact, he did not go to work one day because he was so angry at a coworker.

{¶30} According to Father's various mental health counselors, Father has been diagnosed with (1) intermittent explosive disorder, which results in overreactions to provocation; (2) antisocial personality disorder with strong dependent features, a lifelong diagnosis typically not responsive to counseling, which presents as a rejection of social norms; (3) cannabis use disorder (moderate); and (4) other or substance induced depressive disorder, manifesting in symptoms of depression which may be linked to Father's situation or substance abuse. One of Father's counselors testified that Girlfriend is a "trigger" for Father, and that ongoing contact between the two would hinder Father's ability to manage his anger. The psychologist who performed Father's evaluation for CSB emphasized that Girlfriend's erratic and violent behavior impacts Father's mental health because his dependent personality makes it difficult for him to separate himself from her. Her emotional difficulties become Father's emotional difficulties. Moreover, their interactions have resulted in numerous reports to law enforcement and Father's multiple arrests for domestic violence, as well as an arrest for assault on a neighbor whom Girlfriend had accused of touching her inappropriately, all evidence of Father's difficulty adhering to socially acceptable behavior.

{¶31} There was a general consensus among caseworkers and counselors that, although Father had participated in counseling and made an effort in that regard, he had not demonstrated sufficient progress to support his successful discharge from ongoing services. His lack of success is evidenced in his inability to sever ties with Girlfriend. Although Father claimed that he no longer had a relationship with Girlfriend, multiple witnesses testified to having seen them together near Father's home and near the agency, once as recently as two days before the second date of the hearing. Mother testified that she had been staying with Girlfriend for several days

prior to the second date of the hearing and that she and Girlfriend drove by Father's apartment, where Father and Girlfriend had a brief conversation punctuated by Girlfriend's taunts.

{¶32} One of Father's counselors testified that Father could modify his antisocial behavior only if the modification served his personal interests. No witness disputed Father's interest in his children. However, he consistently demonstrated that his greater interest lay with maintaining a relationship with Girlfriend, rather than meeting the children's needs for safety and security.

{¶33} S.M. and J.M. have their own special needs. Both have IEPs to address deficiencies in certain educational areas. Although Father professed to be very involved in addressing the children's educational needs, he testified that he played video games with his son to address S.M.'s reading and comprehension deficiencies. In addition, both children present with emotional and mental health issues. S.M. has been diagnosed with oppositional defiant disorder, manifesting in explosive anger, tantrums, difficulty following rules, and blaming others for his behavior. Treatment requires skillful parental involvement. Father has not been engaged in developing the necessary parenting skills to address his son's needs, although S.M.'s foster parents' involvement gave rise to the child's significant progress. J.M., too, has been diagnosed with oppositional defiant disorder, and has exhibited some physical aggression towards others, mirroring the violence to which she has been exposed as a result of Father's and Girlfriend's relationship. Father has not demonstrated his ability to terminate his relationship with Girlfriend. Therefore, it is likely that the children would continue to be exposed to violence in their home, were they to be returned to Father's custody.

{¶34} Multiple caseworkers involved in this case, as well as the guardian ad litem, asserted that the children required permanency after almost two years, and that their best interest

could only be served by an award of permanent custody. In all cases, the witnesses emphasized the harm to which the children had been subjected due to exposure to Girlfriend, and Father's refusal or inability to sever his relationship with Girlfriend.

Applicability of R.C. 2151.414(E)(7)-(11) factors

**{¶35}** The fifth best interest factor requires consideration of whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(e).

**{¶36}** In this case, Mother admitted that her parental rights to another child had previously been involuntarily terminated. R.C. 2151.414(E)(11).

Conclusion

**{¶37}** The record demonstrates that the evidence is legally sufficient to sustain an award of permanent custody of the children to CSB. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 11. Moreover, there is nothing in the record to demonstrate that the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of S.M. and J.M. to be placed in the permanent custody of the agency. *See id.* at ¶ 20. The lynchpin of the case in favor of the denial of Father's motion for legal custody and the award of permanent custody to CSB is the abundance of clear and convincing evidence regarding the threat to the children's safety and wellbeing arising from their exposure to Girlfriend, and Father's failure to sever his relationship with her. Despite Girlfriend's threats, verbal assaults, and acts of violence which gave rise to physical, emotional, and psychological harm to the children, Father repeatedly exposed the children to her, notwithstanding the existence of no contact orders issued out of two courts. Moreover, although the children were twice removed from Father due to violent incidents involving Girlfriend, he maintained a relationship with her (even fathering another child), knowing that the children's custodial dispositions hinged on their

best interest, rather than Father's personal desires. As the best interest of the children militated against their further exposure to ongoing acts of violence perpetrated and/or instigated by Girlfriend, and where Father demonstrated an inability or refusal to remove her from his life and the lives of the children, the juvenile court's award of permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence. Father's assignment of error is overruled.

## III.

{¶38} Father's sole assignment of error is overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

TEODOSIO, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

MICHELLE FINK, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and MELODY L. BRIAND, Assistant Prosecuting Attorney, for Appellee.